## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| DAVID FREIFELD and STEVEN BOYLE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNDER ARMOUR, INC., <br><br> Defendant. | Case No. <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs David Freifeld and Steven Boyle, ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, bring this Class Action Complaint against Defendant Under Armour, Inc. ("Under Armour" or "Defendant").

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs bring this class action individually and on behalf of all other individuals who had their sensitive personal information ("Personal Information") disclosed to unauthorized third parties during a data breach compromising Under Armour in November 2025 (the "Data Breach").

2.      On November 17, 2025, the Everest ransomware gang ("Everest") announced that it had stolen 343 GB of Under Armour's internal company data, which included the personal data of millions. To prove the authenticity of its claim, Everest published a sample of the stolen data on its official dark web leak site.[1]

---

[1] Waqas, *Everest Ransomware Says It Stole Data of Millions of Under Armour Users*, HACKREAD

3.    Under Armour has not yet publicly confirmed either the Data Breach or the nature of the data (e.g., names, addresses, and Social Security numbers) disclosed to, or accessed or acquired by, Everest.

4.    According to Hackread, the leaked data includes "customer information and [] shipping history, along with other details, including email addresses, phone numbers, purchase timestamps, product identifiers, prices, quantities, store preference records, location data for cities and regions, marketing campaign logs, deep link tracking entries, and identifiers tied to user accounts and transactions," as well as "customer data, including email addresses, first names, consent status, language preferences, and request timestamps."

5.    Defendant was well aware of or should have known of its data security shortcomings. It collects and maintains sensitive Personal Information about its employees, consumers, and potential consumers, including Social Security numbers ("SSNs") and financial information.

6.    Putting aside that large companies that collect sensitive Personal Information are routinely breached and that Under Armour is aware of this, Under Armour itself suffered a prior data breach in February 2018, which it disclosed the following month.[2]

7.    Under Armour's 2018 data breach exposed the customer data of 150,000,000 users of the Under Armour-owned mobile application MyFitnessPal.[3] Moreover, Under Armour "admitted that some proportion of the exposed passwords were only hashed using a notoriously weak function called SHA-1, which has had known flaws for a decade and was further discredited

---

(Nov. 17, 2025), https://hackread.com/everest-ransomware-under-armour-users-data/.
[2] Luana Pascu, *My FitnessPal Hacked, 150 Million User Accounts Compromised*, BITDEFENDER (Mar. 30, 2018), https://www.bitdefender.com/en-us/blog/hotforsecurity/myfitnesspal-hacked-150-million-user-accounts-compromised/.
[3] *Id.*

2

by research findings [the previous] year."[4]

8.      Nevertheless, Under Armour failed to make necessary changes to implement industry standard data privacy measures, again exposing its customers and, as here, its employees, to the risk of being impacted by a breach.

9.      Defendant's failures to ensure that its servers and systems were adequately secure jeopardized the security of Plaintiffs' and Class Members' Personal Information, and exposed Plaintiffs and Class Members to fraud and identity theft or the serious risk of fraud and identity theft.

10.     As a result of Defendant's conduct and the resulting Data Breach, Plaintiffs and Class Members' privacy has been invaded, their Personal Information is now in the hands of criminals, and they now face an imminent and ongoing risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## PARTIES

11.     Plaintiff David Freifeld is an adult citizen of the state of Illinois and resides in Lake County, Illinois. Plaintiff is a customer of Under Armour and made several purchases from Under Armour's website. Believing Under Armour would implement and maintain reasonable security and practices to protect its customers' Personal Information, Plaintiff Freifeld provided his Personal Information to Under Armour in connection with his purchases from Under Armour.

12.     Plaintiff Freifeld expects to spend significant time dealing with the fallout of the Data Breach, including by enrolling in credit monitoring programs, changing passwords to numerous accounts, obtaining new debit/credit cards, and taking other actions in defense of the

---

[4] Lily Hay Newman, *The Under Armour Hack Was Even Worse Than It Had To Be*, WIRED (Mar. 30, 2018), https://www.wired.com/story/under-armour-myfitnesspal-password-hashing/.

anticipated attacks on his identity, as a result of Defendant's failure to adequately secure Plaintiffs' Personal Information.

13.    Plaintiff Steven Boyle is an adult citizen and resident of Washington, D.C. Plaintiff was an employee of Under Armour from 2015 to 2024. Believing Under Armour would implement and maintain reasonable security and practices to protect its employees' Personal Information, Plaintiff Boyle provided his Personal Information to Under Armour in connection with his employment with Under Armour.

14.    Plaintiff Boyle expects to spend significant time dealing with the fallout of the Data Breach, including by enrolling in credit monitoring programs, changing passwords to numerous accounts, obtaining new debit/credit cards, and taking other actions in defense of the anticipated attacks on his identity, as a result of Defendant's failure to adequately secure Plaintiff Boyle's Personal Information.

15.    Defendant Under Armour, Inc. is a corporation organized under the laws of the state of Maryland, with its principal place of business located in Baltimore, Maryland. Under Armour describes itself as "a leading inventor, marketer, and distributor of branded athletic performance apparel, footwear, and accessories."[5]

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00),

---

[5] Press Release: Under Armour Reports Second Quarter Fiscal 2026 Results; Provides Fiscal 2026 Outlook, UNDER ARMOUR (Nov. 6, 2025), https://about.underarmour.com/en/stories/press-releases/release.25226.html.

there are in excess of 100 Class Members, the action is a class action in which one or more Class

Members are citizens of states different from Defendant, and Defendant is not a government entity.

17.    The Court has personal jurisdiction over Defendant because Defendant is

incorporated in Maryland, maintains its principal office in Baltimore, Maryland, operates in

Maryland, conducts other significant business in Maryland, and otherwise has sufficient minimum

contacts with and intentionally avails itself of the markets in Maryland.

18.    Venue properly lies in this judicial district because, *inter alia,* Under Armour has a

principal place of business in this district; Defendant transacts substantial business, has agents, and

is otherwise located in this district; and a substantial part of the conduct giving rise to Plaintiffs'

claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.    Under Armour Collects and Stores Personal Information

19.    Under Armour routinely collects sensitive personally identifiable information

("PII") and/or protected health information ("PHI")—together, "Personal Information—from its

employees, customers, users, and other individuals in relation to the employment, services, and

products it offers.

20.    In the U.S. Privacy Rights disclosure found on its website, Under Armour states

that it may "collect sensitive personal data, including personal data that reveals a consumer's

precise geolocation and personal data collected and analyzed concerning a consumer's health."[6]

21.    The types of data Under Armour admits to collecting include, but are not limited

to, a user's full name, addresses, phone numbers, email addresses, unique personal identifiers, IP

addresses, financial details, credit or debit card numbers, demographic information, as well as

---

[6] U.S. State Privacy Rights, UNDER ARMOUR (updated July 10, 2024),
https://privacy.underarmour.com/s/article/Residents-of-the-United-States?language=en_US.

specific and private physical characteristics such as sleep habits, nutritional intake, resting heart rate, and BMI.[7]

22.    This is in addition to the sensitive Personal Information Under Armour collects from its employees as part of its onboarding process, which includes collecting SSNs, addresses, and financial details.

23.    Defendant is and was aware of the sensitive nature of the Personal Information it collects, and it acknowledges the importance of data privacy. In the Privacy Policy disclosure on its website, Under Armour claims that it "implement[s] appropriate technical and organizational safeguards to protect against unauthorized or unlawful processing of personal data and against accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to personal data."[8]

24.    Under Armour's Privacy Policy makes clear that it was aware of the need to safeguard the sensitive Personal Information entrusted to it by consumers when they purchased its products or subscribed to, downloaded, installed, or otherwise utilized its services, website(s), or mobile application(s).

25.    Moreover, Under Armour's own 2018 data breach, in which 150 million Under Armour accounts associated with its MyFitnessPal mobile application were compromised, put Under Armour on notice of the potentially severe consequences that follow when such sensitive Personal Information is not adequately secured.

**B.    The Data Breach**

26.    In or about November 17, 2025, a threat actor claimed to have breached Under

---

[7] *Id.*

[8] Security, UNDER ARMOUR, https://privacy.underarmour.com/s/article/Security?language=en_US (last accessed Nov. 18, 2025).

Armour's systems, gaining access to Plaintiffs' and Class Members' sensitive Personal
Information.

27.    Everest, the threat actor, posted to its official website, which is only accessible via
the "dark web," to announce its theft of "a huge variety of personal documents and information of
clients and employees" from Under Armour[9]:



28.    The posted sample contains, among other things, "customer information and their
shopping history, along with other details, including email addresses, phone numbers, purchase
timestamps, product identifiers, prices, quantities, store preference records, location data for cities
and regions, marketing campaign logs, deep link tracking entries, and identifiers tied to user
accounts and transactions."[10]

---

[9] *Everest Ransomware Says It Stole Data of Millions of Under Armour Users*, n.1, *supra*.
[10] *Id.*

29.    Making matters worse, Everest included a seven-day deadline for Under Armour to comply with its ransom demand, instructing Under Armour to follow specific steps to make contact with the ransomware group "before time runs out:"[11]



30.    As of November 21, 2025, Under Armour has made no public acknowledgement of the Data Breach, nor has it yet responded to requests for comment from various publications.[12]

**C.    Impact of the Under Armour Data Breach**

31.    The actual extent and scope, and the impact, of the Data Breach on Under Armour's customers (or other affiliated persons) remains uncertain. Unfortunately for Plaintiffs and Class Members, the damage is already done because their sensitive Personal Information has been disclosed to unauthorized persons during the Data Breach.

---

[11] *Id.*

[12] *See, e.g.,* Stefanie Schappert, *Under Armour hit by ransomware, hackers claim "millions of personal data"*, CYBERNEWS (Nov. 17, 2025), https://cybernews.com/news/under-armour-allegedly-hit-by-ransomware-hackers-claim-millions-of-personal-data; Ellen Jennings-Trace, *Hackers claim to have hit Under Armour in massive data breach – here's what we know, and how you can stay safe*, TECH RADAR (Nov. 18, 2025), https://www.techradar.com/pro/security/hackers-claim-to-have-hit-under-armour-in-massive-data-breach.

32.    Under Armour knew or should have known that its affected IT systems and/or servers are unsecure and do not meet industry standards for protecting highly sensitive customer Personal Information. On information and belief, Under Armour failed to timely make changes to its data security systems, privacy policies, and its IT systems and servers, exposing its customers' Personal Information to the risk of theft, identity theft, and fraud.

33.    The harm caused to Plaintiffs and Class Members by the Data Breach has already been suffered. Even if companies, like Under Armour, that are impacted by ransomware attacks—and the Data Breach has been reported to be such an attack—pay the ransom, there is no guarantee that the criminals making the ransom demands will suddenly act honorably and destroy the sensitive Personal Information. In fact, there is no motivation for them to do so, given the burgeoning market for sensitive Personal Information on the dark web.

34.    The Data Breach creates a heightened security concern for Plaintiffs and Class Members because their SSNs, financial information, and other sensitive information were potentially disclosed. Theft of SSNs creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of his SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

35.    Given the highly sensitive nature of SSNs, theft of SSNs in combination with other personally identifying information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. Per the United States Attorney General, Social Security numbers "can be an identity thief's most valuable piece of consumer information."[13] TIME quotes

---

[13] *Fact Sheet: The Work of the President's Identity Theft Task Force*, DEP'T OF JUSTICE, (Sept. 19, 2006), https://www.justice.gov/archive/opa/pr/2006/September/06_ag_636.html.

data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[14]

36.     Under Armour had a duty to keep Plaintiffs' and Class Members' Personal Information confidential and to protect it from unauthorized disclosures. Plaintiffs and Class Members provided their Personal Information to Under Armour with the understanding that Under Armour would comply with its Privacy Policy and its obligations to keep such information confidential and secure from unauthorized disclosures.

37.     Defendant's data security obligations were particularly important given the substantial increase in data breaches in recent years, including Under Armour's own 2018 data breach, which affected 150 million Under Armour accounts associated with its MyFitnessPal mobile application.

### D.     Theft of Personal Information Has Serious Consequences for Victims

38.     Data breaches are by no means new and they should not be unexpected. Business Insider has noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers. . . . Many of them were caused by flaws in . . . systems either online or in stores."[15] It is well known amongst companies that store sensitive personally identifying information that sensitive Personal Information—like SSNs, financial information, tax information, etc.—is valuable and frequently targeted by criminals.

---

[14] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[15] Dennis Green et al., *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

39.     These types of attacks should be anticipated by companies that store sensitive and personally identifying information, like Under Armour, and these companies must ensure that data privacy and security practices and protocols are adequate to protect against and prevent known and expected attacks.

40.     Theft of Personal Information is serious. The Federal Trade Commission has warned consumers that identity thieves use Personal Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[16]

41.     Indeed, with access to an individual's Personal Information, criminals can do more than simply empty a victim's bank account. They can also commit all manner of fraud, including: obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and SSN to obtain government benefits; obtain lending or lines of credit; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[17]

42.     According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a

---

[16] *See What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 24, 2025).

[17] *See Warning Signs of Identity Theft*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Nov. 24, 2025).

bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[18]

43.     Personal Information is a valuable property right.[19] The value of sensitive personal information as a commodity is measurable.[20] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[21]

44.     Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web and the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen SSNs, financial information, driver's license numbers, and other Personal Information directly on various illegal websites making the information publicly available, often for a price. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

45.     Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal

---

[18] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.
[19] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"),
https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.
[20] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.
[21] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

information for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

46.    Consumers place a high value on the privacy of sensitive data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[22]

47.    There may be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[23]

48.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Personal Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

49.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[24]

50.    It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their Personal Information is forever in cyberspace and was taken by

---

[22] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[23] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[24] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/.

people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

    **E.**    <u>**Under Armour Failed to Act in the Face of a Known Risk of a Data Breach**</u>

51.    Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other similar data breaches, Defendant failed to take reasonable steps to adequately protect the sensitive Personal Information in its possession, leaving its employees, customers, users, and other individuals exposed to risk of fraud and identity theft.

52.    Under Armour is, and at all relevant times has been, aware that the sensitive Personal Information it handles and stores in connection with providing its services and products is highly sensitive. As a company that collects and utilizes highly sensitive and identifying information in connection with providing products, services and employment, Under Armour is aware of the importance of safeguarding that information and protecting its systems and products from security vulnerabilities.

53.    Under Armour was aware, or should have been aware, of regulatory and industry guidance regarding data security, and was alerted to the risk associated with failing to ensure that Personal Information in its possession was adequately secured.

54.    Despite the well-known risks of hackers and cybersecurity intrusions, Defendant failed to employ adequate data security measures in a meaningful way in order to prevent breaches, including the Data Breach.

55.    The security flaws inherent to Defendant's IT systems or servers run afoul of industry best practices and standards. Had Defendant adequately protected and secured its servers or systems, and the sensitive Personal Information stored therein, it could have prevented the Data Breach.

56.     Despite the fact that Under Armour was on notice of the very real possibility of data theft, including through its own prior data breach, it still failed to make necessary changes, and permitted a massive intrusion to occur that resulted in disclosure of Plaintiffs' and other Class Members' Personal Information to criminals.

57.     Defendant permitted Class Members' Personal Information to be compromised and disclosed to criminals by failing to take reasonable steps against an obvious threat.

58.     Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has identified that: "If your data was stolen through a data breach that means you were somewhere out of compliance" with payment industry data security standards.[25]

59.     As a result of the events detailed herein, Plaintiffs and Class Members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from the Data Breach, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information and identities; fraud and identity theft; unreimbursed losses relating to fraud and identity theft; loss of value and loss of possession and privacy of Personal Information; harm resulting from damaged credit scores and information; loss of time and money preparing for and resolving fraud and identity theft; loss of time and money obtaining protections against future identity theft; and other harm resulting from the unauthorized use or threat of unauthorized exposure of Personal Information.

60.     Victims of the Data Breach are subject to an imminent and ongoing risk of harm, including identity theft and fraud.

---

[25] Lisa Baertlein, *Chipotle Says Hackers Hit Most Restaurants in Data Breach*, REUTERS (May 30, 2017), https://www.reuters.com/article/idUSKBN18M2BY/.

61.     As a result of Under Armour's failure to ensure that its impacted systems and servers were protected and secured, the Data Breach occurred. As a result of the Data Breach, Plaintiffs' and Class Members' privacy has been invaded, their Personal Information is now in the hands of criminals, they face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## CLASS ALLEGATIONS

62.     Plaintiffs bring this action on behalf of themselves and the following Class pursuant to Federal Rule of Civil Procedure 23(a) and (b):

> All residents of the United States whose Personal Information was compromised as a result of the Under Armour Data Breach.

63.     Excluded from the Class are: (1) any Judge presiding over this action, members of their immediate families, and Court Staff; and (2) Under Armour, its subsidiaries, parent companies, successors, predecessors, and any entity in which Under Armour, or its parents, have a controlling interest, and its current or former officers and directors.

64.     **Numerosity**: While the precise number of Class Members has not yet been determined, members of the Class are so numerous that their individual joinder is impracticable, as the proposed Class appears to include millions of members who are geographically dispersed.

65.     **Typicality**: Plaintiffs' claims are typical of Class Members' claims. Plaintiffs and all Class Members were injured through Defendant's uniform misconduct, and Plaintiffs' claims are identical to the claims of the Class Members they seek to represent. Accordingly, Plaintiffs' claims are typical of Class Members' claims.

66.     **Adequacy**: Plaintiffs' interests are aligned with the Class Plaintiffs seek to represent, and Plaintiffs have retained counsel with significant experience prosecuting complex

class action cases, including cases involving alleged privacy and data security violations. Plaintiffs and undersigned counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiffs and undersigned counsel.

67.    **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs' and other Class Members' claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class Members individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

68.    **Commonality and Predominance:** The following questions common to all Class Members predominate over any potential questions affecting individual Class Members:

- whether Defendant engaged in the wrongful conduct alleged herein;

- whether Defendant's data security practices resulted in the disclosure of Plaintiffs' and other Class Members' Personal Information and the Data Breach;

- whether Defendant violated privacy rights and invaded Plaintiffs' and Class Members' privacy; and

- whether Plaintiffs and Class Members are entitled to damages, equitable relief,

or other relief and, if so, in what amount.

69.     Given that Defendant engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

70.     **Injunctive and Declaratory Relief:** Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**

71.     Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

72.     Defendant was entrusted with, stored, and otherwise had access to the Personal Information of Plaintiffs and Class Members.

73.     Defendant knew, or should have known, of the risks inherent to storing the Personal Information of Plaintiffs and Class Members, and to not ensuring that its servers and systems, and the Personal Information, were secure. These risks were reasonably foreseeable to Defendant, including because Defendant has previously experienced a data breach.

74.     Defendant owed duties of care to Plaintiffs and Class Members whose Personal Information had been entrusted to it.

75.     Defendant breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate data security. Defendant had a duty to safeguard Plaintiffs' and Class Members' Personal Information and to ensure that their adequately protected Personal Information. Defendant breached this duty.

76.     Under Armour's duty of care arises from its knowledge that its customers entrust it with highly sensitive Personal Information that Under Armour is required to, and represents that it will, handle securely. Indeed, on its website, Under Armour commits to data privacy in its Privacy Policy, including safeguarding sensitive Personal Information.

77.     Only Under Armour was in a position to ensure that its systems, servers, and services were sufficient to protect against breaches and the harms that Plaintiffs and Class Members have now suffered.

78.     A "special relationship" exists between Defendant, on the one hand, and Plaintiffs and Class Members, on the other hand. Defendant entered into a "special relationship" with Plaintiffs and Class Members by agreeing to accept, store, and have access to sensitive Personal Information provided by Plaintiffs and Class Members in connection with their purchase, subscription, and/or utilization of Under Armour's products and/or services.

79.     But for Defendant's wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

80.     Defendant acted with wanton disregard for the security of Plaintiffs' and Class Members' Personal Information.

81.     The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of duties. Defendant knew or should have known it was failing to meet these duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

82.     As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have been harmed and face an imminent and ongoing risk of harm.

83.     As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and

Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT II**
**Negligence Per Se**

84.    Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

85.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Under Armour had a duty to provide adequate data security practices in connection with safeguarding Plaintiffs' and Class Members' Personal Information.

86.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Under Armour had a duty to provide adequate data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

87.    Defendant breached its duties to Plaintiffs and Class Members under the Federal Trade Commission Act (15 U.S.C. § 45), the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801 *et seq.*) ("GLBA"), the Maryland Consumer Protection Act (Md. Code Ann., Com. Law §§ 13-101 *et seq.*) ("MCPA"), Maryland Personal Information Protection Act (Md. Code Ann., Com. Law §§ 14-3501 *et seq.*) ("MPIPA"), among other statutes, by failing to provide fair, reasonable, or adequate data security in connection with the sale of athletic products and services in order to safeguard Plaintiffs' and Class Members' Personal Information.

88.    Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

89.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

90.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of duties. Defendant knew or should have known that it

was failing to meet its duties, and that a breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

91.    As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class Members have been harmed and face an imminent and ongoing risk of harm.

92.    As a direct and proximate result of Defendant's negligence per se, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

### COUNT III
### Breach of Implied Contract

93.    Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

94.    Under Armour sold or sells fitness apparel and services to Plaintiffs and Class members, or Plaintiffs and Class Members provided their Personal Information to Under Armour as employees, customers, or in some other capacity.

95.    In connection with their business relationship, Plaintiffs and Class Members entered into implied contracts with Under Armour.

96.    Pursuant to these implied contracts, Plaintiffs and Class Members provided Under Armour with their Personal Information. In exchange, Under Armour agreed, among other things: (1) to take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' Personal Information; and (2) to protect Plaintiffs' and Class Members' Personal Information in compliance with federal and state laws and regulations and industry standards.

97.    The protection of Personal Information was a material term of the implied contracts between Plaintiffs and Class Members, on the one hand, and Under Armour, on the other hand. Had Plaintiffs and Class Members known that Under Armour would not adequately protect its customers' Personal Information, they would not have done business with Under Armour.

98.    Plaintiffs and Class Members performed their obligations under the implied contract when they provided Under Armour with their Personal Information.

99.    Necessarily implicit in the agreements between Plaintiffs/Class Members and Under Armour was Under Armour's obligation to take reasonable steps to secure and safeguard Plaintiffs' and Class Members' Personal Information.

100.    Under Armour breached its obligations under its implied contracts with Plaintiffs and Class Members by failing to implement and maintain reasonable security measures to protect their Personal Information.

101.    Under Armour's breach of its obligations of its implied contracts with Plaintiffs and Class Members directly resulted in the Data Breach.

102.    The damages sustained by Plaintiffs and Class Members as described above were the direct and proximate result of Under Armour's material breaches of its agreements.

103.    Plaintiffs and other Class Members were damaged by Under Armour's breach of implied contracts because: (i) they have suffered actual harm or identity theft; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their Personal Information, for which there is a well-established national and international market; (vi) they were deprived of the benefit of their bargain; and/or (vii) they lost time and money incurred to mitigate and remediate the effects of the breach, including the increased risks of identity theft they face and will continue to face.

**COUNT IV**
**Breach of Fiduciary Duty**

104.    Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

105.    A relationship existed between Plaintiffs and Class Members and Defendant in which Plaintiffs and Class Members put their trust in Defendant to protect the Personal Information of Plaintiffs and Class Members and Defendant accepted that trust.

106.    Defendant breached the fiduciary duties that they owed to Plaintiffs and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the Personal Information of Plaintiffs and Class Members.

107.    Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiffs and Class Members.

108.    But for Defendant's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

109.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiffs and Class Members.

110.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs are entitled to and demand actual, consequential, and nominal damages, and injunctive relief.

**COUNT V**
**Violations of the Maryland Personal Information Protection Act**
**Maryland Code Ann., Com. Law §§ 14-3501 *et seq.***

111.    Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

112.    This Count is brought pursuant to the MPIPA, which applies to Defendant because it is incorporated and headquartered in Maryland and/or engages in substantial business in Maryland, and because Defendant owns or licenses computerized data which includes Personal Information as defined under MPIPA. Md. Code Ann., Com. Law §§ 14-3501(b)(1)-(2).

113.    Plaintiffs and Class Members are "individuals" or "consumers" as defined under MPIPA. Md. Code Ann., Com. Law §§ 14-3502(a), 14-3503.

114.    Plaintiffs' and Class Members' compromised information includes Personal Information as defined under PIPA. Md. Code Ann., Com. Law § 14-3501(d).

115.    Defendant violated MPIPA by:

    a.    failing to "protect personal information from unauthorized access, use, modification, or disclosure";

    b.    failing to "implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information owned, maintained, or licensed"; and

    c.    failing to ensure its third-party service providers "implement and maintain reasonable procedures and practices[.]"

116.    Defendant's failures and omissions were material because they were likely to induce consumers into purchasing, subscribing, or otherwise utilizing Defendant's products and/or services under the reasonable, but ultimately mistaken, assumption that Defendant would adequately safeguard their sensitive Personal Information.

117.    Plaintiffs and the Class reasonably relied on Defendant's misrepresentations concerning its data privacy and security protocols.

118.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and

Class Members have been harmed and face an imminent and ongoing risk of harm.

119.    On information and belief, Plaintiffs' Personal Information is now in the hands of cybercriminals and is in imminent danger of being published.

120.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT VI**
**Violation of the Maryland Consumer Protection Act**
**Maryland Code Ann., Com. Law §§ 13-101 *et seq*. ("MCPA")**

121.    Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

122.    This Count is brought pursuant the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 *et seq.* ("MCPA"), which applies to Defendant because it is incorporated and headquartered in Maryland and/or engages in substantial business in Maryland.

123.    Plaintiffs and the Class are "consumers" as defined under the MCPA § 13-101(h).

124.    Under Armour advertises, offers, or sells "consumer goods" and "consumer services" under the MCPA. Md. Code Ann., Com. Law § 13-101(d).

125.    The MCPA prohibits "any unfair, abusive, or deceptive trade practice[.]" Md. Code Ann., Com. Law § 13-303.

126.    Defendant violations of the MCPA represent direct and proximate causes of the Data Breach. These violations include Defendant's:

    a.    failure to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' Personal Information;

    b.    failure to identify foreseeable security risks relating to customer privacy, to remediate the identified security risks, and to adequately improve security and

private measures following previous cybersecurity incidents including Defendant's own major 2018 data breach;

c.    failure to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801 *et seq*.;

d.    omission, suppression, and concealment of the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' private personal information; and

e.    omission, suppression, and concealment of the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801 *et seq*.

127.    Defendant's failures and omissions were material because they were likely to induce consumers into purchasing, subscribing, or otherwise utilizing Defendant's products and/or services under the reasonable, but ultimately mistaken, assumption that Defendant would adequately safeguard their sensitive Personal Information.

128.    Plaintiffs' and the Class reasonably relied on Defendant's misrepresentations concerning its data privacy and security protocols.

129.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have been harmed and face an imminent and ongoing risk of harm.

130.    On information and belief, Plaintiffs' Personal Information is now in the hands of

cybercriminals and is in imminent danger of being published.

131.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT VII
## Invasion of Privacy (Intrusion Upon Seclusion)

132.    Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

133.    Plaintiffs and Class Members had a reasonable expectation of privacy in the Personal Information that Defendant disclosed without authorization.

134.    By failing to keep Plaintiffs' and Class Members' Personal Information safe, knowingly employing inadequate data privacy policies and protocols, and disclosing Personal Information to unauthorized parties for unauthorized use, Defendant unlawfully invaded Plaintiffs' and Class Members' privacy by, *inter alia*:

a.    intruding into Plaintiffs' and Class Members' private affairs in a manner that would be highly offensive to a reasonable person; and

b.    invading Plaintiffs' and Class Members' privacy by improperly using their Personal Information properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

c.    failing to adequately secure Personal Information from disclosure to unauthorized persons;

d.    enabling the disclosure of Plaintiffs' and Class Members' Personal Information without consent.

135.    Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' and Class Members' position would consider its actions highly offensive.

136.    Defendant knew that its IT systems and servers were vulnerable to data breaches prior to the Data Breach.

137.    Defendant invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by disclosing their Personal Information to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

138.    As a proximate result of such unauthorized disclosures, Plaintiffs' and Class Members' reasonable expectations of privacy in their Personal Information was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiffs' and Class Members' protected privacy interests.

139.    In failing to protect Plaintiffs' and Class Members' Personal Information, and in disclosing Plaintiffs' and Class Members' Personal Information, Defendant acted with malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private.

140.    Plaintiffs seek injunctive relief on behalf of the Class, restitution, and all other damages available under this Count.

## COUNT VIII
## Unjust Enrichment

141.    Plaintiffs reallege and incorporate all previous factual allegations as though fully set forth herein.

142.    This claim is pleaded in the alternative to the implied contract claim.

143.    Under Armour has profited and benefited from the monies or fees paid and the Personal Information provided by Plaintiffs and Class Members to receive services from Under Armour.

144.    Under Armour has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of the misconduct and omissions described herein, Plaintiffs and Class Members did not receive services of the quality, nature, fitness, or value represented by Under Armour and that reasonable consumers expected.

145.    Under Armour has been unjustly enriched by its withholding of and retention of these benefits, at the expense of Plaintiffs and Class Members.

146.    Equity and justice militate against permitting Under Armour to retain these profits and benefits.

147.    Plaintiffs and Class Members suffered injury as a direct and proximate result of Under Armour's unjust enrichment and seek an order directing Under Armour to disgorge these benefits and pay restitution to Plaintiffs and Class Members.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the Class, by and through undersigned counsel, respectfully request that the Court grant the following relief:

A.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiffs as class representatives and undersigned counsel as class counsel;

B.    Award Plaintiffs and Class Members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C.    Award declaratory and injunctive relief as permitted by law or equity to assure that Class Members have an effective remedy, including enjoining Defendant from continuing the unlawful practices as set forth above;

D.    Award Plaintiffs and Class Members pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Award Plaintiffs and Class Members reasonable attorneys' fees, costs, and expenses,
as allowable; and

F.      Award Plaintiffs and Class Members such other favorable relief as allowable under
law or at equity.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:  November 24, 2025                    Respectfully submitted,

                                             */s/ Steven M. Nathan*
                                             Steven M. Nathan (Bar ID # 30618)
                                             **HAUSFELD LLP**
                                             33 Whitehall Street, 14th Floor
                                             New York, NY 10004
                                             Tel: 646.357.1100
                                             snathan@hausfeld.com

                                             */s/ James J. Pizzirusso*
                                             James J. Pizzirusso (Bar ID # 20817)
                                             **HAUSFELD LLP**
                                             1201 17th Street N.W., Suite 600
                                             Washington, D.C. 20036
                                             Tel: 202.540.7200
                                             jpizzirusso@hausfeld.com

                                             */s/ Cyril V. Smith*
                                             Cyril V. Smith (Bar ID # 07332)
                                             **ZUCKERMAN SPAEDER LLP**
                                             100 East Pratt Street – Suite 2440
                                             Baltimore, Maryland 21202
                                             Tel: 410-332-0444
                                             Fax: 410-659-0436
                                             csmith@zuckerman.com

                                             Tina Wolfson (pro hac vice forthcoming)
                                             twolfson@ahdootwolfson.com
                                             Sarper Unal (pro hac vice forthcoming)
                                             sunal@ahdootwolfson.com
                                             **AHDOOT & WOLFSON, P.C.**
                                             2600 W. Olive Avenue, Suite 500
                                             Burbank, CA 91505-4521

Telephone: (310) 474-9111
Facsimile: (310)474-8585

***Attorneys for Plaintiffs and the
Proposed Class***